**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JEFFREY COACHMAN,<br>also known as "Jeff,"<br><br>Defendant. | Criminal No. 13-cr-305-20 (ESH) |

**DETENTION MEMORANDUM**

Jeffrey Coachman ("Defendant" or "Mr. Coachman") has been charged in one count of a Superseding Indictment with Conspiracy to Distribute and Possess with Intent to Distribute One Kilogram or More of Heroin, 500 Grams or More of Cocaine, and 28 Grams or More of Cocaine Base, in violation of 21 U.S.C. § 846. The Government seeks forfeiture under 21 U.S.C. §§ 853(a), (p) and 18 U.S.C. § 982.

The Government requested a detention hearing. The Government submitted on November 25, 2013, a First Memorandum in Support of Pretrial Detention ("First Detention Memorandum") [11], on November 26, 2013, a Second Memorandum in Support of Pretrial Detention ("Second Detention Memorandum") [15], and on December 2, 2013, a Third Memorandum in Support of Pretrial Detention ("Third Detention Memorandum") [48]. The Third Detention Memorandum pertains to Mr. Coachman. The undersigned held the detention hearing for Mr. Coachman on December 3, 2013. At the conclusion of the hearing, the Court found the Defendant should be held without bond. This memorandum is submitted to comply with the statutory obligation that, "the judicial officer shall include written findings of fact and a written statement of the reasons for the detention." 18 U.S.C. § 3142(i)(1).

**Findings of Fact**

At the detention hearing, the Government proceeded by proffer based on the Counts in the Superseding Indictment. The Government incorporated its Third Detention Memorandum in its proffer.

The following findings of fact are common to all defendants for whom detention hearings were held on November 25 and 26, 2013, and December 3, 2013. Since approximately February of 2013, the FBI Safe Streets Task Force, in partnership with other law enforcement agencies, has conducted an investigation into the activities of a narcotics organization based in Maryland and the Washington, D.C., metropolitan area. This network obtained its narcotics primarily from a supplier in Texas. That supplier and his organization are also part of the FBI's investigation. The FBI has made particularly extensive use of court-authorized interception of wire and electronic communications. The FBI has employed various other investigative techniques in this investigation, including controlled purchases of narcotics, analysis of toll records and pen register data, physical surveillance, court-authorized global positioning system ("GPS") data collection, traffic stops, and the execution of search warrants.

As to the organization in the District of Columbia metropolitan area, the Government alleges this group was led by Juan Floyd, a co-defendant listed in the Superseding Indictment.[1] He was the hub of a criminal organization that had many spokes in the D.C. area. The Government alleges Juan Floyd obtained wholesale narcotics primarily from a supplier in Texas, Armando Gamez ("Mr. Gamez"). Mr. Gamez was the head of his Texas-based organization, and worked with co-conspirators to export large quantities of heroin, cocaine, cocaine base, and marijuana from Texas to the District of Columbia metropolitan area. Juan Floyd, with the assistance of his co-conspirators, then redistributed the drugs to local customers for use and in some cases for further resale. Mr. Floyd and Mr. Gamez used multiple drug couriers and various methods of travel to facilitate their money and drug transactions, and money laundering scheme. The investigation culminated in a "take down" on November 20, 2013, in the Washington, D.C., area in which almost all of the defendants were apprehended and many of their residences searched.

[1] Note that Juan Floyd's brother, John Floyd, is also a co-defendant.

The following findings of fact are specific to the Defendant, Mr. Coachman. The Government stated that Mr. Coachman purchased heroin and cocaine base from Juan Floyd. These purchases were infrequent and small enough that the Government characterized Mr. Coachman as a low level member of this criminal conspiracy, but frequent and large enough that the Government characterized them as amounts suited to redistribution. Mr. Coachman was arrested on April 26, 2013, several months prior to the take down that took place on November 20, 2013. He remains detained on those charges, which are pending in the Superior Court of the District of Columbia.

Prior to his arrest, law enforcement captured telephone conversations between Mr. Coachman and Juan Floyd using a court-authorized wiretap. The men spoke in code typical of the drug trade. For example, Mr. Coachman and Mr. Floyd spoke on the telephone on April 16, 2013:

> Coachman said, "[Expletive] man, [expletive] I need you man, get ready, go to that fight man." Juan Floyd responded, "Yeah, okay, alright, that ain't no problem." Coachman stated, "Alright, ugh . . . when you about on the way I'm gonna meet you at that place." Juan Floyd asked, "Oh, alright. Where you going, on 2d?" Coachman replied, "Yeah, same as." Juan Floyd said, "Oh, alright." Coachman said, "Ok, bet." That same afternoon, at approximately 5:51 p.m., activation 274, Juan Floyd said to Coachman, "Yeah, I'm going to be headed your way in a minute. I had to sit down man and make the sandwich." Coachman said "Alright."

[48] at 8.

The Government's interpretation of that coded conversation is as follows:

> It is believed that Coachman requested to purchase heroin from Juan Floyd ("go to that fight"). Juan Floyd confirmed that Coachman wanted two grams of heroin (on 2nd Street). Coachman said yes, same as he usually bought ("yeah, same as"). Shortly thereafter, Juan Floyd told Coachman he (Juan Floyd) would be coming to see Coachman in a minute because Juan Floyd had to cut the narcotics ("make the sandwich").

*Id.* at 8-9.

Transcripts of other recorded telephone conversations confirm that Mr. Coachman and Mr. Floyd spoke in code to make arrangements for drug deals. On April 26, 2013, Mr. Coachman asked if Mr. Floyd would be coming into the District of Columbia. The transcript of the call continues:

> Juan Floyd explained that he had things to do with his daughter's mother. Coachman asked Juan Floyd if he was coming through "the city." Juan Floyd said no, he was on the highway. Coachman explained, "ah [expletive], man, I got to go to the minimarket . . . I got to go get this medicine so I won't catch no [expletive] cold, man, so I won't get sick man, know what I mean?" Juan Floyd said, "Yeah," and that he could not get to Coachman until he was done with his things. They planned to meet later on 34th and Blane Streets. At approximately 10:45 a.m. that same morning, activation 1951, Juan Floyd told Coachman to hurry up because he was sitting on the corner waiting for Coachman. Coachman said he was coming. Coachman did not meet Juan Floyd that day because he was arrested by members of the Metropolitan Police Department on Georgia Avenue, NW, Washington, D.C., for possession of heroin and a firearm in the vehicle. That case is pending in the Superior Court of the District of Columbia.

*Id.* at 10.

The Government also proffered that, while detained on the narcotics and firearm charges pending in Superior Court, Mr. Coachman made arrangements with Mr. Floyd and with Mr. Coachman's wife to hide others of Mr. Coachman's firearms. For example, Mr. Coachman told Mr. Floyd, on a three-way telephone call including Mr. Coachman's wife, "'Hey cuz, I want you to get all my tools, though, man,'" to which Mr. Floyd responded that he would "'take care of it.'" *Id.* at 10. The Government viewed this as an agreement that Mr. Floyd would gather and hide Mr. Coachman's firearms while Mr. Coachman was detained.

In addition to the charge in the Superseding Indictment and the charges pending in Superior Court, Mr. Coachman's criminal record includes a conviction of a firearms charge, conviction for possession of heroin, and an old conviction (2001) for possession of marijuana. The Government and Defense agreed that Mr. Coachman was, at the time of his arrest on April 26, 2013, on parole following one of the previous convictions. They disagreed as to which conviction was associated with that parole.

The Defense argued that the Government's proffer supported only the assertion that Mr. Coachman is a heroin user and addict. The transcript indicating he was afraid of becoming sick if he could not meet with Mr. Floyd supported this assertion. Where the Government argued Mr. Coachman purchased enough narcotics to redistribute, the Defense stated that the Government's proffer only indicated small transactions, such as two (2) grams. Purchases in such low volumes are generally for personal use, the Defense argued. The Defense sought Mr. Coachman's release and argued that what he needs is treatment, not incarceration.

**Discussion**

I. Legal Standard

The Bail Reform Act of 1984, 18 U.S.C. § 3141 *et seq.*, provides, in pertinent part, that if a judicial officer finds by clear and convincing evidence that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the [defendant] before trial." 18 U.S.C. § 3142(e). Thus, even absent a flight risk, danger to the community alone is a sufficient reason to order pretrial detention. *United States v. Salerno*, 481 U.S. 739, 755 (1987); *United States v. Perry*, 788 F.2d 100, 113 (3d Cir. 1986); *United States v. Sazenski*, 806 F.2d 846, 848 (8th Cir. 1986). A rebuttable presumption arises that a defendant constitutes a danger to the community when there is probable cause to believe that the defendant has committed a violation of the Controlled Substance Act for which a maximum penalty of 10 years or more is prescribed. *See* 18 U.S.C. §§ 3142(e), (f)(1)(C); *United States v. Mosuro*, 648 F. Supp. 316, 318 (D.D.C. 1986) (holding that a grand jury indictment establishes probable cause sufficient to create a rebuttable presumption under § 3142(e)). In such a case, it is presumed that no pretrial release condition or combination of conditions can be presumed to ensure a defendant's future presence in court or to reasonably ensure the safety of the community. *See* 18 U.S.C. § 3142(e)(3).

To determine whether release conditions can rebut the presumption that a defendant constitutes a danger to the community, the judicial officer shall take into account the available information concerning (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics, including the defendant's ties to the community; and (4) the nature and seriousness of the danger to any person or to the community which would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g).

II. The Four Factors

    A. Nature and Circumstances of the Offense

The first factor, the nature and circumstances of the offense, favors detention. The transcripts of intercepted telephone calls clearly indicates narcotics transactions involving heroin,

a highly dangerous and damaging drug. Although it is as yet unclear whether Mr. Coachman played a more significant role in this alleged conspiracy than that of a consumer, he is clearly implicated in this alleged conspiracy. Therefore, the nature and circumstances of the offense favor detention.

B. The Weight of the Evidence

The second factor, the weight of the evidence, favors detention. Mr. Coachman was recorded on the wiretap using the sort of coded language commonly associated with the drug trade. His own admissions on the calls support the notion that he purchased drugs. His telephone call with Mr. Floyd, while Mr. Coachman was detained, suggests he may have been more deeply involved in the criminal conspiracy beyond being a consumer. Therefore, the evidence weighs against the Defendant, and favors detention.

C. The History and Characteristics of the Defendant

The third factor, the history and characteristics of the Defendant, favors detention. He has multiple convictions on his criminal record, including narcotics convictions and a firearms conviction. Mr. Coachman's exposure to the criminal justice system has not caused him to avoid illicit activity. The Defendant's history and characteristics favor detention.

D. The Danger to the Community

The fourth factor, the danger to the community, strongly favors detention. The wiretapped telephone conversations suggest that Mr. Coachman was a regular purchaser of dangerous narcotics. The drugs involved here pose a significant danger to the community even in relatively small quantities. His prior firearms conviction, his pending firearms charge at Superior Court, and the call he made while detained apparently asking Juan Floyd to find and hide Mr. Coachman's remaining firearms, all suggest that Mr. Coachman may pose a danger to the community if released at this time. Therefore, the final factor, danger to the community, weighs strongly in favor of detention.

**Conclusion**

Based upon consideration of all the evidence and the factors set forth in § 3142(g) and weighing all the lesser restrictive alternatives to pretrial detention, this Court concludes by clear and convincing evidence that no condition nor combination of conditions exist that would ensure Defendant's appearance and the safety of the community.  Therefore, the Government's motion for detention without bond is granted.


Dated: 12/3/2013                                        /s/
                                                                    ALAN KAY
                                                                    UNITED STATES MAGISTRATE JUDGE